**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **CMH MANUFACTURING,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CIVIL NO. JKB-21-0674** |
| **SERVAIS EVRARD NEIL, *et al.*,** | * | |
| **Defendants.** | * | |

* * * * * * * * * * * *

## MEMORANDUM

Presently pending before the Court is CMH Manufacturing's ("CMH") Motion for an Award of Punitive Damages against Servais Neil and his company, BPN Partners, Ltd. ("BPN") (collectively, the "Contractors"). (ECF No. 76.) CMH argues that the facts establishing liability, as well as additional facts revealed by post-judgment discovery, militate in favor of an award equal to three times its $1,166,927.72 compensatory damages obtained through the entry of default judgment in this case ("Default Judgment"). (*See* ECF No. 24.) The Contractors argue that those facts, as well as other considerations, warrant no award of punitive damages. (*See* ECF No. 148.) The Motion is ripe for disposition and the parties agree that no hearing or additional proceedings are required to resolve this Motion. (*See* ECF Nos. 152, 153.) For the following reasons, a separate Order shall issue awarding CMH an amount of punitive damages equal to 30% of its compensatory award—$350,078.32.

### *I. Background*

This matter has proceeded in two main stages. In the first, CMH obtained a Default Judgment against the Contractors as to liability based on their failure to respond to or defend the

allegations in CMH's Complaint. (*See* ECF No. 24.) In the second, the Court ordered limited discovery in order to develop additional facts potentially relevant to the appropriate award of punitive damages. (ECF No. 42.) The facts establishing liability are set forth in more detail in this Court's initial Memorandum (ECF No. 23) and are only briefly reiterated here.

***A. Facts Related to Liability***

The core of CMH's claims was that the Contractors had defrauded it. CMH alleged that the Contractors perpetrated this fraud by invoicing payments for services that they had not performed and reimbursements that they had not paid to vendors. (*See* Compl. ¶¶ 19, 20, ECF No. 1.) In sum, these fraudulent requests led CMH to overpay the Contractors by $1,123,077.07 (the "Overpayment"). (*Id.* ¶ 23.)

When CMH realized that these payments had been fraudulently procured, it immediately demanded that the Contractors repay the full amount. As the Contractors were unable to immediately repay the Overpayment, the parties instead entered into a Settlement and Forbearance Agreement (the "Settlement Agreement") as well as a Promissory Note that provided a schedule by which the Contractors would repay the amounts owed. (*See id.* ¶¶ 30, 33–34; *see also* ECF Nos. 1-5 (Settlement Agreement), 1-6 (Promissory Note).) After the Contractors defaulted on the Promissory Note, CMH filed the instant lawsuit seeking to recover the Overpayment as well as interest due and owing, amounting to $1,166,927.72 (the "Debt"). (*Id.* ¶ 39.)

After the Contractors failed to defend against CMH's Complaint, CMH filed a Motion for Default Judgment (ECF No. 22), and the Court entered a Default Judgment and awarded CMH compensatory damages in the amount of the Debt. (ECF No. 24.) However, the Court declined to award various equitable remedies (including unjust enrichment, a constructive trust, and the denial of a putatively fraudulent conveyance) or punitive damages. (*See generally* ECF No. 23.)

CMH then moved to alter or amend the Judgment, seeking all of the remedies initially sought in its Motion for Default Judgment but previously denied by the Court. (ECF No. 31.) This prompted the Contractors' first substantive involvement in this matter in the form of an Opposition to the Motion to Alter/Amend. (ECF No. 32.)

On reconsideration, this Court again denied the various equitable remedies sought by CMH. (*See generally* ECF Nos. 41, 42.) However, it concluded that an award of punitive damages was potentially appropriate given the facts giving rise to the Contractors' liability. (*See* ECF No. 42 ¶ 3.) It further concluded that the limited record available did not permit it to adequately consider the factors for determining an appropriate award of punitive damages, as required by Maryland law. (ECF No. 41 at 14–16.) Thus, the Court ordered limited discovery and supplemental briefing on the propriety and amount of an award of punitive damages. (ECF No. 42 ¶ 4.)

***B. Facts Related to Punitive Damages***

The limited discovery ordered by the Court has revealed two categories of facts relevant to the determination of punitive damages: (1) facts related to additional alleged business frauds perpetrated by Neil and (2) facts related to the Contractors' financial ability to pay an award of punitive damages.

***1. Additional Alleged Material Conduct***

CMH offers three incidents that it alleges further establishes a pattern of fraud or misrepresentation by Neil.

***a. The Baltimore Property***

The first of these incidents further elaborates on a key theme raised by CMH's Complaint and for which is previously sought equitable relief, namely that Neil used the Overpayment to

purchase a property in Baltimore as tenants in the entireties with his wife (the "Baltimore Property") as a means of placing those funds out of the reach of his creditors. (*See* ECF No. 76 at 2–3.) On the one hand, the Contractors argue that the additional evidence adduced in discovery defeats CMH's attempts to tie the purchase of this property to the Overpayment, as it shows "that only $10,000 was paid from [the BPN account] towards the purchase of the Baltimore Property" and that "Plaintiff acknowledges that Mr. Neil himself deposited $20,000 into the BPN Account[.]" (ECF No. 148 at 9.) CMH rejoins that, even if some of the $200,000 Neil paid for the Baltimore Property was "proceeds of Mr. Neil's independently owned DC Property" commingled with the Overpayment, the gravamen of its allegation is that Neil took steps to hinder, delay and defraud it by placing his assets into the Baltimore Property. (ECF No. 149 at 4–5.)

***b. Oilfield Services***

Second, CMH argues that, following the signing of the Settlement Agreement, Neil took further steps to impair CMH's ability to collect the Debt. Specifically, it alleges that when "negotiating the Settlement Agreement, Mr. Neil advised that he and BPN had certain 'Business Opportunities' with Marathon and other third-parties that would facilitate their ability to repay [CMH and] pledged those Business Opportunities . . . as collateral for their obligations to [CMH]." (ECF No. 76 at 7; *see also* Settlement Agreement at 10, Compl. Ex. D, ECF No. 1-4.)[1] CMH perfected its security interest in the Business Opportunities on December 16, 2020. (ECF No. 76 at 7–8.)[2]

[1] Specifically, the Settlement Agreement stated that: "Neil has represented to CMH that, since submitting the Dispute Applications and receiving payments thereunder, the Contractors have developed and received numerous business opportunities with third-parties to perform work as a subcontractor under general contractors other than CMH" which were defined "severally and collectively, [as] the 'Business Opportunities.'" (Settlement Agreement at 3.)

[2] CMH does not appear to have included these documents in the record in this case, though the state of the electronic record and the volume of CMH's filings makes confirming this point difficult.

Shortly after, on January 27, 2021, Neil created another business entity—NMSD Oilfield Services, LLC ("Oilfield Services"), allegedly to avoid the security interest in Neil's Business Opportunities held by CMH. (*See* Neil Dep. Tr. at 63–64, Mot. Punitive Damages Ex. J, ECF Nos. 96-1–96-2.) On March 9, 2021, Oilfield Services—with Neil as its signatory—entered into a Master Major Service Contract with Marathon Oil Company (the "Marathon Contract"). (*See* Marathon Contract, ECF No. 76-6 at 2, 54.) Neil did not provide notice of the Marathon Contract to CMH although CMH argues such notice was required under a clause in the Settlement Agreement providing that "Contractors shall furnish to CMH . . . [a]s soon as available, and in any event within five (5) days after the creation of such information, all records related to the creation, development, engagement, or continuation of all Business Opportunities[.]" (Settlement Agreement at 8.) The parties dispute whether Neil and Oilfield Services satisfactorily performed under the Marathon Contract and whether any inadequate performance amounted to fraudulent misrepresentation. (*Compare* ECF No. 76 at 6–7 (arguing Oilfield Services misrepresented the work done on the Marathon Contract), *with* ECF No. 148 at 7 (arguing that the disputes about the scope of work on the Marathon Contract are "insufficient to demonstrate any fraudulent misrepresentations").)

On April 14, 2021, Oilfield Services—again with Neil as its signatory—entered into an Accounts Receivable Purchase and Security Agreement with FundThrough USA, Inc. (the "Factoring Agreement") which was used to factor the accounts receivable on the Marathon Contract. (*See* ECF No. 76-7; Neil Dep. Tr. at 89.) In entering the Factoring Agreement, Oilfield Services covenanted that it would "not create, incur, assume or permit to exist any security interest or lien or any form of adverse ownership interest or claim upon or with respect to any Purchased Account or Collateral in which [FundThrough] now or hereafter holds an ownership or a security

interest." (ECF No. 76-7 at 4.) CMH argues that this misrepresented the fact that CMH held a perfected security interest in the accounts receivable under the Marathon Contract based on its security interest in the Contractors' Business Opportunities. (ECF No. 76 at 5.)

*c. The Mott Lawsuit*

Third, CMH also cites to a lawsuit brought by Kevin Mott against Neil, Oilfield Services, and Kenneth Denny in Hood County, Texas. (*See id.*) That lawsuit alleged that Neil had committed fraud in the creation of Oilfield Services by incorporating it as "a single-member LLC, rather than a 4-member LLC as allegedly agreed." (*Id.*) Although the case was later non-suited, CMH alleges it is material because Neil represented in his discovery responses that "[o]ther than [CMH], nobody has ever accused [Neil] of making a fraudulent misrepresentation or fraudulently suppressing information." (*See* ECF No. 76-9 at 12–13.)

*2. Neil's Finances*

The Contractors argue that the other salient fact revealed through discovery is additional information regarding Neil's financial status. (*See* ECF No. 148 at 3–5.) Specifically, although Neil and his various businesses (including BPN) have assets totaling around $555,000, those assets are far eclipsed by his present debts. In addition to the compensatory damages awarded in this case, BPN and Oilfield Services have lines of credit loans in the amounts of $750,000 and $480,000, respectively. Combined, Neil's debts total nearly $2.4 million, more than four times his current assets.

In addition to this present balance sheet, Neil has a one-year employment contract as a consultant for Impact Housing under which he makes $17,500 per month. (Neil Dep. Tr. at 53–54.) Here again the parties dispute the salience of this fact, with CMH emphasizing it as evidence of Neil's strong present and future earning potential while the Contractors counter that it is a one-

year contract and Neil presently has no future employment prospects or other income. (*Compare* ECF No. 76 at 15–16, *with* ECF No. 148 at 5.)

***II. Legal Standard***

Under Maryland law, "the purpose of punitive damages is to punish the defendant for egregiously bad conduct toward the plaintiff, and also to deter the defendant and others contemplating similar behavior." *Bowden v. Caldor, Inc.*, 710 A.2d 267, 276 (Md. 1998) (internal quotation marks and citation omitted). In assessing the appropriate award of punitive damages, the Maryland Court of Appeals has outlined "nine 'legal principles or considerations which should guide a trial court[.]'" *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 843 (Md. 2004).[3] Those considerations are:

(1) The gravity of the defendant's wrong;
(2) The defendant's ability to pay;
(3) The deterrence value of the amount awarded by the jury, under all the circumstances of the case;
(4) Comparison of the punitive damages award to the civil or criminal penalties that could be imposed for comparable misconduct;
(5) Comparison of the punitive damages award to other final punitive damages awards in the jurisdiction;
(6) Other final and satisfied punitive damages awards against the same defendant for the same conduct;
(7) If the punitive damages award is based on separate torts, whether all the torts grew out of a single occurrence or episode;
(8) Plaintiff's reasonable costs and expenses resulting from the defendant's malicious and tortious conduct which are not covered by the award of compensatory damages; and
(9) The relationship between the punitive and compensatory awards in the case.

*See Bowden*, 710 A.2d at 278–85.

[3] Although these factors were developed to "guide a trial court in determining if a punitive damage award is excessive[,]" *id.*, the parties agree that those same factors are instructive here. (*See* ECF No. 76 at 10; ECF No. 148 at 8); *see also Quan v. TAB GHA F&B, Inc.*, Civ. No. TDC-18-3397, 2021 WL 4129115, at *3 (D. Md. Sept. 10, 2021), *report and recommendation adopted by*, *Quan*, 2021 WL 6881288 (D. Md. Nov. 9, 2021).

It is "clear, however, that the factors are not criteria that must be established but, rather, guideposts to assist a court in [determining] an award." *Darcars*, 841 A.2d at 843. Overall, "a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages." *Bowden*, 710 A.2d at 277 (quoting *Owens-Illinois v. Zenobia*, 601 A.2d 633, 657 (Md. 1992)).

***III. Analysis***

In assessing punitive damages in this case, the Court does not write on a blank slate. Rather, the pattern of business fraud, default judgment, and consideration of punitive damages is an unfortunately frequent occurrence in this District. *See, e.g.*, *Quan v. TAB GHA F&B, Inc.*, Civ. No. TDC-18-3397, 2021 WL 4129115, at *3 (D. Md. Sept. 10, 2021), *report and recommendation adopted by*, *Quan*, 2021 WL 6881288 (D. Md. Nov. 9, 2021); *Gallman v. Sovereign Equity Group, Inc.*, Civ. No. AW-11-2750, 2012 WL 1820556, at *7 (D. Md. May 15, 2012); *HBCU Pro Football, LLC v. New Vision Sports Props., LLC*, Civ. No. WDQ-10-0467, 2011 WL 2038512 (D. Md. May 24, 2011) (Gessner, M.J.). Those prior cases, which also involved substantial compensatory awards, have typically involved awards of punitive damages in the range of 40-50% of compensatory damages. *See Quan*, 2021 WL 4129115, at *5 ($250,000; 50%); *Gallman*, 2012 WL 1820556, at *7 ($100,000; 40%); *HBCU Pro Football*, 2011 WL 2038512, at *9 ($1,000,000; 40%). Both parties argue that the facts of this case break from this trend though, unsurprisingly, they each believe the case is an outlier in their favor. (*Compare* ECF No. 76 at 10 ("Each of the *Bowden* factors supports a maximal punitive damages award[.]"), *with* ECF No. 148 at 9 (capitalization omitted) ("All nine *Bowden* factors support an award of zero punitive damages[.]").) Perhaps also unsurprisingly, a neutral assessment of the evidence proffered by the

parties shows that this case is, for the most part, routine rather than extreme.[4] Applying the relevant *Bowden* factors, the Court concludes that Neil's fraud supports an award of punitive damages, but that the appropriate award lies slightly below the low-end of the typical range due to Neil's financial circumstances.

Notably, though the background of this case is largely framed in terms of the Contractors, the parties agree that the proper unit of analysis for purposes of punitive damages is Neil, as there are no other relevant actors at BPN and some of the allegedly material facts involve Neil acting through other business entities. (*See* ECF No. 76 at 1 ("Discovery has revealed that Mr. Neil repeatedly defrauded [CMH] and other parties[.]"); ECF No. 148 at 15 ("Mr. Neil is not the elaborate swindler that [CMH] paints him to be.").) Accordingly, except where relevant, the Court's analysis is framed in terms of Neil though, of course, the ultimate award of punitive damages will be assessed jointly and severally against the Contractors.

### *A. Gravity of Neil's Wrong*

"The most important legal rule in this area, applicable to every punitive damages award, is that the amount of punitive damages 'must not be disproportionate to the gravity of the defendant's wrong.'" *Bowden*, 710 A.2d at 278 (quoting *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1128 (Md. 1995)). Here, while Neil has admitted to engaging in intentional fraud, "simply because the defendant has engaged in some 'heinous' or 'egregiously bad conduct' does not necessarily justify a large award of punitive damages. Under Maryland law, engagement in such conduct is a prerequisite for *any* award of punitive damages." *Id.* (emphasis in original).

The Court concludes that a meaningful award of punitive damages is warranted by Neil's subsequent efforts to hinder CMH in recovering the Overpayment (and, subsequently, the Debt).

[4] In prior correspondences, the parties confirmed that this assessment could be done by the Court on the papers. (*See* ECF Nos. 151–53.)

Neil's negotiation of, then immediate default on, the Settlement Agreement, as well as his noncompliance with its notice provisions with respect to the Marathon Contract delayed CMH's ability to recover the Overpayment and required CMH to seek judicial assistance to obtain meaningful relief. (*See* ECF No. 1 ¶ 38 (noting that Contractors made none of the payments required under the Settlement Agreement).) In *Quan*, the court concluded that defendant's similar efforts to "induc[e] Plaintiff 'into continued negotiations over repayment' that it never intended to honor" warranted a punitive damages award of $250,000—50% of the compensatory award. *Quan*, 2021 WL 4129115, at *4. While Neil now represents he intends to satisfy his repayment obligations, the Court finds that his prior conduct substantially delayed CMH's ability to take meaningful steps towards recovering the fraudulent Overpayment.[5] This additional layer of misconduct substantiates an award of punitive damages in line with prior cases.

That said, Plaintiff's efforts to turn *Quan* from a ceiling to a floor are unavailing. (*See* ECF No. 76 at 18.) In *Quan*, defendants' efforts to hinder recovery delayed plaintiff from filing suit for more than two years, while here the Settlement Agreement delayed CMH five months. *Quan v. TAB GHA F&B, Inc.*, 2020 L 374619, at *2–3 (D. Md. Jan. 23, 2020); (*see also* ECF No. 1-4 (Settlement Agreement signed Oct. 9, 2020); ECF No. 1 (Complaint filed March 17, 2021).) Moreover, defendant "made no effort to convince the Court that a lesser award of punitive damages is warranted." *Quan*, 2021 WL 4129115, at *4. Although CMH raises several arguments as to why the conduct in this case is far more egregious than that in *Quan*, a review of those arguments

[5] CMH also argues that Neil has continued to dissemble by failing to identify the Mott lawsuit in response to a discovery request to "identify every person, other than [CMH], who has ever accused you of making a fraudulent misrepresentation or fraudulently suppressing information." (*See* ECF No. 149 at 5 (internal quotation marks and citation omitted).) While the Court acknowledges the discrepancy identified by CMH, it concludes that the failure to disclose the Mott lawsuit (which was non-suited) does not materially alter its assessment of Neil's conduct in this case.

shows that none sufficiently distinguishes this case from those that have previously rendered punitive awards between 40% and 50% of compensatory damages.

***1. Repeated Misconduct***

CMH argues that the egregiousness of Neil's fraud is amplified by his repeated misconduct. *See BNW of N.A. v. Gore*, 517 U.S. 559, 576–77 (1996) ("Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law."). First, it emphasizes that Neil submitted "**seventeen** Fraudulent Applications over the course of several months" in committing the initial fraud. (ECF No. 76 at 12 (emphasis in original).) However, the Court fails to see how the number of applications makes the overall fraud more "egregious" or "heinous." *Cf. Gore*, 517 U.S. 576–77 (considering evidence that defendant had committed the same fraud in distinct cases as "part of a nationwide pattern of tortious conduct"). Assuming the amount defrauded remained constant, CMH does not explain how Neal's misconduct would have been materially better had he packed his fraud into two or three applications or materially worse if it had been two or three dozen.

Indeed, *Bowden* itself warns against disaggregating "an episode that was one continuous occurrence and improperly pyramiding the claims" in assessing punitive damages. *Bowden*, 710 A.2d at 282. Similarly, the gravamen of *Gore* is that "a *recidivist* [i.e., one who commits multiple distinct offenses] may be punished more severely than a first offender[,] recogniz[ing] that repeated misconduct is more reprehensible than an individual instance of malfeasance." 517 U.S. at 577 (emphasis added). Here, CMH's own Complaint establishes that the most rational way to construe Neal's misconduct is as a single claim for fraud. (Compl. at 11–12.) Accordingly, the

fact that this fraud was effectuated in several arguably discrete steps does not substantially distinguish it from *Quan* and similar cases.

Second, CMH argues that Neal's subsequent misrepresentations to FundThrough and Marathon reflect a pattern of misconduct that renders the at-issue fraud more egregious. (ECF No. 76 at 13–14.) However, despite providing some evidence that Neal made misrepresentations to these companies, neither FundThrough nor Marathon appears to have made (much less proven) claims against Neal for fraud. "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis[.]" *State Farm Auto. Ins. Co. v. Campbell*, 538 U.S. 480, 423 (2003). Rather, "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.* Nor can this claim be bootstrapped into one for recidivism, as that assessment requires "conduct in question [that] replicates [ ] *prior* transgressions." *Id.* (emphasis added) (citing *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 n.28 (1993)). In short, the appropriate penalty if Neal defrauded FundThrough or Marathon is a punitive damage award in favor of FundThrough or Marathon, not an amplification of the award in favor of CMH.

***2. Comparison to Cases Awarding Multiplicative Punitive Damages***

That Neil's conduct does not justify a multiplicative punitive damages award is also confirmed by considering the limited authorities CMH identifies that have granted or upheld such significant awards in the context of fraud and asset concealment: *Rolleston v. Estate of Sims*, 558 S.E.2d 411, 414 (Ga. Ct. App. 2001) and *in re Landbank Equity Corp.*, 66 B.R. 949, 962 (Bankr. E.D. Va. 1986). In the former (which upheld a jury award), the defendant was not plaintiff's arms-length business partner but both her lawyer and "long-time family friend" and the underlying

misconduct included not just intentional fraud, but breaches of fiduciary duties. *See Rolleston v. Cherry*, 487 S.E.2d 354, 356 (Ga. Ct. App. 1997).[6]  *Landbank*, where the court awarded treble damages, also involved fraud by corporate insiders in positions of fiduciary responsibility and, moreover, a massive cover-up of this fraud including "more than ninety (90) [ ] other entities . . . between and among which the assets of Landbank were passed" with "[f]unds [ ] transferred constantly" and by which "[m]illions of dollars of property has vanished," in a scheme ultimately requiring fifteen investigative accountants and 2,900 hours to untangle. *Landbank*, 66 B.R. at 953. CMH has not satisfactorily explained how the facts of this case—involving fraud between arms-length business partners and efforts imposing a five-month delay before turning to judicial process—are comparably heinous. *See Bowden*, 710 A.2d at 278 ("[I]n determining whether the amount of the award is []proportionate to the gravity of the defendant's conduct, it is the degree of heinousness which is important.").

At bottom, Neil undoubtedly defrauded CMH and then exacerbated this fraud with further misrepresentations of prompt payment and the potential double-pledging of assets.  This conduct can be rightly described as heinous and egregiously bad, but those harsh words only open the door to punitive damages. *Bowden*, 710 A.2d at 278.  Other courts beginning from this baseline have found that comparable conduct warrants a punitive damages award of 40%-50% of compensatory

---

[6] It is also not clear that *Rolleston* should be considered a multiplicative award of punitive damages. While the jury awarded $900,000 in damages with respect to the fraudulent conveyance action, the fraudulent conveyances had been in response to "a $5,200,000 judgment entered against [defendant and in favor of plaintiff] in 1995 for claims of professional negligence, breach of fiduciary duty, and fraud relating to his legal representation[.]" *Rolleston*, 558 S.E.2d at 413. Comparing the punitive damages award to *only* the damages for the fraudulent conveyance would be analogous to here, considering only CMH's costs in recovering the Debt (rather than the Debt itself), in awarding punitive damages. In contrast, comparing the punitive damage award in *Rolleston* to the compensatory award for both the initial torts and the subsequent fraudulent conveyance reduces the punitive/compensatory ratio close to the 50% awarded in *Quan*. CMH does not explain why this is not the more apt metric and it certainly does not suggest that the Court should consider only its costs of recovery in awarding punitive damages. *Rolleston*, 558 S.E.2d at 413–14 (upholding award of $3.25 million in punitive damages in series of cases resulting in award of $6.1 million in compensatory damages). Last, faithfully translating this case into the Maryland punitive damages framework would also require acknowledging that the defendant in *Rolleston* had between $12 and $15 million in assets and no other stated liabilities suggesting a far different framework for the remainder of the punitive damages analysis. *Id.* at 413.

damages and CMH provides no compelling arguments to depart from this well-established conclusion. *Quan*, 2021 WL 4129115, at *5 ($250,000; 50%); *Gallman*, 2012 WL 1820556, at *7 ($100,000; 40%); *HBCU Pro Football*, 2011 WL 2038512, at *9 ($1,000,000; 40%). Indeed, the few examples of multiplicative damages it has identified only confirm that Neil's conduct is, oxymoronically, run-of-the-mill egregious. *Cf. Landsbank*, 66 B.R. at 952 (emphasis in original) ("As with any word, it can be misapplied for the occasion, but the word *saga* seems to have salient application here . . . The canvas upon which Landbank Equity Corporation splashed was unbelievably enormous laying upon it at once a successful business, a family, a covey of investors and a flock of sheep.").

Accordingly, application of "[t]he most important legal rule in this area" anchors the Court's analysis of the appropriate punitive damages award in the realm of prior cases in this District. It now turns to whether any of the remaining *Bowden* factors warrant a material departure from that lodestar range.

***B. Neil's Ability to Pay***

"A second very important principle, long recognized under Maryland law, is that the amount of punitive damages 'should not be disproportionate to the defendant's ability to pay.'" *Id.* (quoting *Ellerin*, 652 A.2d at 1130)). Here, the parties do not dispute that Neil lacks the assets to pay even the compensatory award in this case—and that these assets are further strained by other outstanding debts he owes. (*See* ECF No. 148 at 11–12; ECF No. 149 at 2–4 (arguing that this present asset position is not dispositive of the analysis).) The Contractors argue that this fact distinguishes *Quan*, where the "Court ha[d] no information about the current financial position of [the defendant]." 2021 WL 4129115, at *4. In their view, Neil's present financial circumstances warrant awarding no or *de minimis* punitive damages. (ECF No. 148 at 15 (arguing that punitive

damages should either not be awarded or $8,446.28, one-third of Neil's present liquid assets).) While the Court concludes that Neil's financial state[7] counsels in favor of a smaller punitive damages award, it rejects the Contractors' argument that these facts should functionally eliminate such an award.

As an initial matter, Maryland law is clear that the nature of the defendant's conduct is the principal touchstone for determining punitive damages. *Bowden*, 710 A.2d at 278. Having already found that Neil's conduct warrants a meaningful award of punitive damages, negating such damages based on his present financial condition would, essentially, invert that priority. Rather, the Court finds that the appropriate balance of these circumstances is outlined in *Al-Sabah*, which assessed the propriety of a jury's award of punitive damages based on the defendant's financial circumstances. *Al-Sabah v. Agbodjogbe*, Civ. No. SAG-17-0730, 2020 WL 1307388, at *9–*10. In ordering a partial remittitur of the jury's award of $1 million in punitive damages, the court considered what sum would "serve[] three purposes: [ ] to further the [ ] intent in awarding punitive damages; [to] account for a valuation of Defendants' net worth that is not against the clear weight of the evidence; and [to not be] designed to financially ruin Defendants." *Id.* at *10. In balancing these purposes, the court ultimately granted a substantial award of punitive damages, $250,000, despite the possibility that "[d]efendants cannot make even meaningful payments on the compensatory damages award." *Id.*

Further, while *Al-Sabah* primarily looked to the defendant's present assets in determining the propriety of the award,[8] there is also evidence in this case that Neil—who presently makes $210,000 peryear—has strong earning potential. Although he represents that he "has no other

[7] None of the evidence proffered suggests that the Contractors' financial status is materially distinct from Neil's.
[8] This was largely because the court there concluded that the jury had improperly calibrated its award "to match or exceed the maximum valuation of [d]efendants' remaining net worth[.]" *Al-Sabah*, 2020 WL 1307388, at *9.

income, and he is not under contract to receive any income in 2023 or beyond" (ECF No. 148 at 5), these present facts are not dispositive of the analysis where the record suggests strong earning potential. *See Van Dusen v. Prywes*, 223 Md. App. 782, 2015 WL 5885236, at *6 (Md. Ct. Spec. App. 2015) (concluding "punitive damages awards were not disproportionate to [ ] ability to pay" where defendant held "numerous advanced degrees" despite evidence suggesting present yearly income was only $18,000). In short, while Neil's present financial circumstances counsel in favor of a smaller award of punitive damages, they do not eliminate the appropriateness of such a substantial award.

***C. Other Factors***

The remaining factors do not significantly alter this assessment, and the Maryland Court of Appeals has stressed that "the factors are not criteria that must be established but, rather, guideposts" and that "not all are pertinent in every case involving [ ] punitive damage awards." *Darcars*, 841 A.2d at 843. Accordingly, the Court addresses the remaining arguments raised by both parties and then turns to a final disposition of this issue.

***1. Deterrence***

Although "one of the purposes of punitive damages is to deter the defendant," here, the deterrence analysis largely tracks with the assessment of the gravity of Neil's wrong. *See Bowden*, 710 A.2d at 279. "[R]epeated or frequent misconduct of the same nature, misconduct of long duration, attempts to conceal or cover-up the misconduct, failure to take corrective action, and similar circumstances, support the deterrence value of a significant award." *Id.* (collecting cases). Applied here, these circumstances echo the facts that led the Court to conclude Neil's misconduct was sufficiently heinous to warrant a significant punitive damages award in the first instance. Indeed, in arguing that deterrence supports a substantial award, CMH again cites that "Mr. Neil

(1) repeatedly lied to Clayton in writing in order to steal over $1 million, and (2) actively concealed those lies[,]" essentially reiterating its prior argument. (ECF No. 76 at 16.) Thus, increasing the punitive award based on a deterrence rationale would unnecessarily double count these facts.

Even to the extent that deterrence is an independent consideration in this case, CMH offers no explanation why it is not achieved by an award of punitive damages in the hundreds of thousands (rather than millions) of dollars. *See Gore*, 517 U.S. at 584 ("The sanction imposed [ ] cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal."). Simply put, knowing that fraudulent business conduct will require not just full compensation, but a punitive premium (in an amount determined by the egregiousness of the fraud), is sufficient to deter both Neil and others from considering such conduct and therefore deterrence does not weigh in favor of an additional penalty, as deterrence goals in this case are achieved through a meaningful punitive sanction and increasing that sanction would not serve independent deterrence purposes.

***2. Comparison to Civil or Criminal Fines***

The parties also dispute the comparison of a potential award of punitive damages to the applicable civil or criminal fines for similar conduct. CMH suggests that the Contractors' misconduct should be viewed through the lens of the federal criminal wire fraud statute, which it asserts would carry a maximal civil fine of $18,000,000 (adopting the same disaggregated approach rejected by the Court in assessing factor one and including the fraud against FundThrough).[9] (ECF No. 76 at 18.) In contrast, the Contractors explain that the conduct should

[9] Notably the $1,000,000 penalty per offense for wire fraud applies only "[i]f the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution." *See* 18 U.S.C. § 1343. However, because the Court determines that a comparison to criminal offenses is categorically unhelpful, it need not dwell excessively on the correct calculation of the relevant criminal fine.

be compared to the penalty for "willfully making a false statement or representation to obtain a benefit or payment under the Longshore and Harbor Workers' Compensation Act[,]" though they provide little explanation for the proposition that this is "an analogous statute to the conduct at issue here." (ECF No. 148 at 12–13.)

The oddities inherent in both positions reflects the fact that "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third *indicium of excessiveness*" but is often unhelpful in determining an award in the first instance. *See Bowden*, 710 A.2d at 280 (emphasis added) (quoting *Gore*, 517 U.S. at 583); *see also State Farm*, 538 U.S. at 428 ("When used to determine the dollar amount of the award, however, the criminal penalty has less utility."). To the extent such a comparison is helpful, the Supreme Court has explained that the most relevant comparator is the "civil sanction under [state] law . . . for an act of fraud." *State Farm*, 538 U.S. at 428. "Article 27 of the Maryland Code includes numerous fraud offenses, with the largest maximum fine for any of these being $10,000." *Ellerin*, 652 A.2d at 1130 n.13 (noting further that the maximum civil fine under Maryland law is $1,000,000 and "[t]he greatest maximum fine for a so-called 'commercial' crime is $500,000"). Thus, while the Court concludes that this guidepost is largely unhelpful, properly applied, it suggests punitive damages in the amounts awarded in prior cases rather than the amounts recommended by CMH. *Cf. State Farm*, 538 U.S. at 428 ("Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award.").

***3. Attorneys' Fees***

The final factor worth discussing in this case is that a "plaintiff's reasonable costs and expenses resulting from the defendant's malicious and tortious conduct, including the expenses of litigation, which are not covered by the award of compensatory damages, are matters which

appropriately can be considered in judicially reviewing an award of punitive damages." *Bowden*, 710 A.2d at 282–83 (collecting cases). In this case, the Settlement Agreement provides CMH with a contractual entitlement to attorneys' fees. (*See* Settlement Agreement at 13.) Thus, this factor does not significantly affect the calculation of punitive damages and will be considered at a later date when CMH seeks such fees. (*See* ECF No. 42 (denying without prejudice CMH's prior Motion for Attorneys' Fees).)

***D. Disposition***

An exhaustive consideration of the parties' positions in this case largely returns the Court to its initial point: there is a well-established range of punitive damages awarded for the fact pattern of business fraud, cover-up, and default. *See Quan*, 2021 WL 4129115, at *5 ($250,000; 50%); *Gallman*, 2012 WL 1820556, at *7 ($100,000; 40%); *HBCU Pro Football*, 2011 WL 2038512, at *9 ($1,000,000; 40%). Though granted substantial leeway to discover relevant evidence, CMH has failed to establish material differences between this case and those prior data points, much less the sorts of fraud that have previously sustained multiplicative awards of punitive damages.

This case is materially distinct in one respect, however—Neil has come forward with evidence of his present financial status that increases the hardship and limits the social benefits of a punitive damage award. *See Quan*, 2021 WL 4129115, at *4 ("[T]he Court has no information about the current financial position of TAB."); *Gallman*, 2012 WL 1820556, at *7 (noting defendants "have failed to make any appearance in this case"); *HBCU Pro Football*, 2011 WL 2038512, at *8 ( "[Plaintiff] conceded at the hearing that it did not present any evidence regarding [defendant's] ability to pay."). While the Contractors' view that this financial hardship precludes a significant punitive damages award is misplaced, the Court finds that it warrants a material downward departure from the range awarded in otherwise analogous cases. Accordingly, and

considering the totality of circumstances presented by the parties' filings, the Court concludes that the appropriate award of punitive damages is 30% of the compensatory award, $350,078.32.

***IV. Conclusion***

For the foregoing reasons, a separate Order shall issue amending the Court's prior judgment in favor of CMH (ECF No. 24) to include an award of $350,078.32 in punitive damages on CMH's claim of fraudulent misrepresentation (Count IV).

DATED this 9 day of August, 2022.

BY THE COURT:

James K. Bredar
James K. Bredar
Chief Judge